Good morning, Your Honors. May it please the Court, Benjamin Au for appellants Britta Walder, Howard Walder, Tom Hersch and Harish Shah. I'd like to reserve two minutes for rebuttal. As the Court knows, there are two issues involved in this appeal. With the Court's permission, I'd like to begin with the Sienta issue first because I believe it will take the most amount of time. With the Sienta issues first. Just to give some context here, this is not a case that involves one defendant throwing up blanket denials. This is a case involving four defendants who testified consistently across parallel proceedings whose evidence was corroborated by the testimony was corroborated by other evidence. A case, by the way, where appellants and their families lost a total of $20 million of their own money every single set, including commissions earned from brokering the Radical Bunny loan participations. And notwithstanding that context, the district court here granted summary judgment by disregarding appellant's testimony as uncorroborated and unsubstantiated and resolved credibility issues that belonged to the jury. The first basis. Maybe I'm wrong about this, and correct me if I am. When Mr. Hersch testified that he understood at the time the documentation necessary to perfect the collateral promise to investors was nonexistent or defective in numerous respects, which created an exposure for Radical Bunny and a risk to the participants. Now, let's just stick with that. Sure, Your Honor. What's wrong with that as sort of a mea culpa on Sienta, if you don't mind my mixing the Latin? Absolutely. What Mr. Hersch testified was that he became aware at one point that there were problems with the documentation of the collateral, but he also testified consistently, as did the other appellants, that they always understood that the problems with collateral came in the issue of perfecting the collateral, perfecting the documentation, not that collateral didn't exist. And there is absolutely no testimony anywhere in the record that counsel who had been retained to the court. I'm just saying that what he was saying was, I knew that there were some outstanding deeds of trust which had not been recorded. Is that what he's saying? Well, not quite deeds of trust, because that's not quite the misrepresentation that the SEC alleges. But, yes, he's saying that he was aware, he became informed by counsel, that at some point they believed that the collateral had not been perfected. Perfected means usable. No, Your Honor. In this context, there was ample evidence that Mortgages Limited had communicated an understanding to appellants about the security interests. That includes a UCC-1 filing that they filed with the Secretary of State. There's two levels of collateral here. And the one they were worrying about perfection on was the security interest in the assets of Mortgage Limited. And that's what the big fight about, have we gotten it perfected properly? But then there were, quote, the deeds of trust, the real mortgage, the property that had the mortgages on it, which it seemed to be represented to the buyers that they had an interest in those deeds of trust. There was never any doubt that that wasn't the perfection we're talking about, is it? Actually, Your Honor, there's a substantial issue of fact here. Because the only document that the SEC relies on to establish that that was the representation, that Radical Bunny or investors held deeds of trust themselves, is ER-1527. ER-1527 is a single slide from a PowerPoint presentation for which there is no testimony explaining that to be a purported representation on behalf of Radical Bunny. On the contrary, there is testimony at ER-875 from, example, Berta Walther, who says, no, that was not our representation of our security. That was what we required Mortgages Limited to have of their security. ER-1010 is another example where Mr. Hirsch says the same thing. So there is actually quite a dispute here as to what the ---- were collateralized by the beneficial interest under various deeds of trust held by Mortgage Limited. Right. Those are two separate issues. Because the district court, that was the basis for the district court's finding for Sienter. And that language comes directly from the UCC-1 that Mortgages Limited filed with the Arizona Secretary of State. The SEC has a second different basis for their misrepresentation, which is this idea that Radical Bunny told their participants that the deeds of trust were personally held by Radical Bunny or the investors. And that is a dispute. If I may continue, sticking with this topic here of the language that came from the UCC-1, there is abundant evidence in the record that corroborates appellants' understanding that they had this security interest. One was the UCC-1. Chris Olson, the CFO of Mortgages Limited, testified at ER-1072 that he understood this to give the security interest that Mortgages Limited told Radical Bunny that they gave. There's a personal guarantee for Mortgages Limited's CEO and sole shareholder. You can find that at 1531 and 502. At the time, Mr. Coles was on paper worth over $200 million, more than enough to guarantee the entire amount of Radical Bunny's loans to Mortgages Limited. There were letters that Mortgages Limited sent to Radical Bunny to their auditors. You can find an example at 1441 where they say, yes, your loans are secured by our assets. Same thing with the ER-505. There's a list of real property where Mortgages Limited provided that to Radical Bunny's attorneys at their request, saying, here is a list of real property securing your loans. So there is actually, and just to continue the list, there are promissory notes. You can find examples at 1447. There are audited financials that were published by Mortgages Limited. ER-492, Section 11, you'll find an example where they say exactly that language, that Radical Bunny's loans were secured by the interests, all of the interests that Mortgages Limited had in their assets, which included those deeds of trust. The way it worked, as you are probably familiar, is that while there was an original program, the bulk of the loan participations that Radical Bunny coordinated were loans to Mortgages Limited. Mortgages Limited, in turn, lent that money to real developers in the Phoenix area, all Phoenix area developments. Who owns the property? Who owns the property. Who gave deeds of trust for mortgages. Correct, Your Honor. But they weren't perfected. Well, there is an issue about whether they were perfected. The key issue here, Your Honor. The key issue is what was represented by Radical Bunny to its investors regarding the nature and quality of the security which the investors were receiving. Now, what's your answer to that? Yes. And the key answer, the key issue, is exactly what you found in the directions to purchase, which is that Radical Bunny has a beneficial interest in the deeds of trust held  Now, the question is, does this mean that Radical Bunny has, has not, may have, or will have upon perfection, but has? That's the past. Well, again, Your Honor, this is language that comes verbatim from the UCC-1. And what we are talking about here is a scienter issue. Now, if Radical Bunny knew, pardon me, if the individual defendants knew that there was a step to be taken between what was inchoate security interest and what was perfected, and they didn't reveal that, do you consider that to be a material representation? Materiality generally under the Fan case, SEC v. Fan, is an issue for the jury as well. But I will agree with you, Your Honor, that that would be a key issue. However, whether I mean, there's a difference between a hope and a fact, right? Your Honor? There's a difference between a hope and a fact. Well, it's more than that, Your Honor. One of the core issues in this case is what did counsel really tell the appellants? And while counsel has said that they, on May 7th of 2007, while they represent that they instructed Radical Bunny to stop work, they actually, there's no testimony anywhere saying that they instructed Radical Bunny to make any further disclosures. There's consistent testimony from the appellants. But wasn't there a discussion? Wasn't there a statement in there that you're in big trouble if you continue to do what you're doing? That statement came from, purportedly came from a mortgages limited attorney, which triggered the appellants to retain counsel in the first instance. It was the chronology here is Wouldn't that be some evidence of scienter? It is probative of scienter, Judge Wallace. But the issue is, you know, here appellants were told that. They went out and hired not just counsel, but a really top-notch securities firm to investigate the issue. They were never told, not once were they ever told that you need to make a further disclosure. And while Quarles and Brady does testify that they said to stop work, that issue is highly disputed, and there are many reasons why a jury could find credibility problems with Quarles and Brady. Let me just name a few examples. Hoffman, the lead counsel for Quarles and Brady with this matter, testified that he never provided any written memoranda of his authority, of his advice. His partner, Robert Bornhoff, said that he knew that Radical Bunny had not stopped working after that May of 07 date, and he had no problem with it. Robert Kant, a senior partner at Greenberg Trawick, who was mortgages limited's partner, testified that in the fall of 07, six months after that reported stopped work, he had said that the Quarles attorneys that he worked with were not really looking at compliance issues and it wasn't on their radar. That's testimony that you'll find at 1127. Whether it meets the burden. The question I'm interested in is, is do you take the position that Howard Walfer and Shaw knew about this? No, Your Honor. Your Honor, it's our position that they did not know about it. The Court was required to do an individual-by-individual analysis, and we believe that they failed to do so. What the SEC has done is group pleading, group proof, joint and several liability, which is not appropriate in a case involving Santer. All right. Well, you're not submitting that that has been done. So we'll let your opposition tell us where it is in the record. Okay. But just to finish the thought on Quarles and Brady, you know, there is we asked the Court to take judicial notice of their settlement agreement with the Radical Bunny participants. It was worth of $25 million. That is ripe, a ripe subject for cross-examination. I think what we ultimately have here is a situation where the appellants said that they weren't told to stop work. There's no dispute that they were never told to make further disclosures. So judging Santer then becomes a credibility issue between appellants and Quarles and Brady, and that belongs to a jury. There is evidence corroborating. Let me see if I understand you. Suppose an attorney tells me you better stop because you're going to be in big trouble. Don't I have a responsibility to tell my investors? I think the responsibility would then be to hire your own counsel because you were told by someone who wasn't. But if I don't do that because you're a lawyer and I'm not a lawyer, I'm just listening, so the person says, okay, from now on we'll tell the investors that we've been advised to this. They could do that. They could do that. They could also fail to do it. What's their situation? Well, I think that the issue here is were there, were appellants' actions, did they that's required for Santer. And by hiring their own counsel to investigate the issue, I don't believe that that rises to the floor. So hire a counsel or not, unless you have some other evidence. If somebody tells you that you were in big trouble making these types of investments, how can you go out and ask for investments without disclosing that information and not be accused, assuming they did? Well, actually, Your Honor, you're correct. And in the record, and it's actually an undisputed fact, appellants did tell people to tell participants on multiple meetings that they did hire counsel to investigate this very issue. But did they tell them that they had received information that they may be in violation? Your Honor, I would submit that that's a distinction without a difference. Well, you're fudging now. Okay. Well, can I explain why I believe that? They have information. They've hired a lawyer. Okay, that's fine. But they have information. And I'm suggesting for you to respond directly that if you have that information, whether you hire a lawyer or not, that you have responsibility to tell investors that you've received that information. You can say it's wrong. I don't think that it's – I don't necessarily think it's a prudent thing to do to – You don't think that's a violation? Well, I don't think – I think that you have to put it in the context of the facts, which is, you know – Scienter. Scienter. Thank you, Your Honor. I'll reserve the remaining ten seconds of my time. To clear your throat. May it please the Court, I want to also pick up on the Scienter issue since that's where we spent our time. And I actually just want to talk – Is your name for the record? Pardon me, Your Honor. Jeff Berger for the Securities and Exchange Commission. Can I straighten out a factual – I thought it was an undisputed fact that it was represented to the investors that their investment was collateralized by Deeds of Trust. That's correct. Okay. He says the district judge made that finding by just citing the UCC statement and that that is not an undisputed fact. No. It's undisputed, and you can take it from Hirsch's own testimony as well as other sources, that what this investment about was an investment secured by real estate. Well, the directions to purpose – the directions to purchase said, quote, your investment is collateralized by the beneficial interest under various Deeds of Trust held by Mortgage Limited. And that was false. That's a false statement. It's about as clear as you can make it. Judge, I think this answer is better than your answer. I'll take that. But I did want to talk a little bit more about how this was actually structured. The promise was made to investors that the investors would have the secured interest. The debate about whether Radical Bunny – actually, I shouldn't even say debate. There's no debate at all. What the attorneys told the Radical Bunny defendants about the security of Radical Bunny's interest in Mortgage Limited, that's a step removed from whether the investors have a secured interest in whatever Radical Bunny may or may not get. The investors received nothing from Mortgage Limited. Their interactions were solely with Radical Bunny. So the only way the investors can get anything out of this is either directly through Mortgage Limited, and there's no documentation to that, or through Radical Bunny, which is why when the defendants met with the attorneys from Radical Bunny – about the security interest that Radical Bunny held in Mortgage Limited, and they learned that the documentation was either defective or nonexistent, that made their statement false and misleading, and they knew it, or were reckless in not knowing it at the time. You know, your argument is one that talks about they, defendants, and the rest, and I understand that. But what's left out is some place in the record where you can show me that Howard Walder and Shaw actually knew this information. Sure, and I – Connecting up individuals, because I'm sure you agree in Sandra, you can't do it generally, you have to do it for each one of the accused. That's correct, and we have done that throughout, and we're not suggesting group pleading or anything like that. All right. If you go to Howard Walder's deposition, he is asked specifically about the information he learned from the attorneys. I apologize, I don't have the page numbers right off the top of my head. It's in his deposition. He's asked, is this information that would have been important to you as an investor? He says, yes, that is information that would have been important to me as an investor. But you didn't disclose it. No, we didn't. Did he say in his deposition that he had received that information? From the attorneys? Any source. He says he was aware of it, and he was copied on all the e-mails sent by the Quarles and Brady's attorneys to him. I'm saying e-mails, but some are letters, some are e-mails. In Shaw, you would want to look at both his deposition testimony and his investigative testimony that preceded the deposition in this case. Shaw was not copied on those e-mails and letters from the Quarles and Brady's attorneys, but he's asked specifically about his knowledge about the difference between what the Radical Bunny, what Radical Bunny received and what's been called the pass-through program in terms of security and what Radical Bunny received in the new program, the investment program. He's asked specifically about the difference between those two things and acknowledges the weakness in the collateral received in the latter program versus the earlier program. Do you identify that in your brief? Yes. And what page of your brief would I look at so that I could go look at the record and make sure that Synder actually is tied into those two people? May I just grab my brief quickly? Of course. You want to look at pages 43 and 44 of our brief, particularly towards the bottom. Now, I will say some of the citations to the record that come before that are also citations to Howard Walders in Shaw's testimony, but the paragraph at 43 to 44 is dealing specifically with the issue about Walder and Shaw. Okay. And from that, I can find what you indicate will demonstrate there's Synder individually to those two people. Yes, as to their exact testimony. I will also just add one other thing, and this is made at different points in the brief, with regard to their recklessness about how this program was set up. Walder and Shaw, and I'm really referring to all the defendants, but I'm focusing on Walder and Shaw since that's what we're discussing here, were involved with the previous Radical Bunny Program when they actually received deeds of trust. They purchased securities from Mortgage Limited Securities, a commission-registered broker-dealer, and they received deeds of trust assigned to them in their name. They then converted to this new investment program. They didn't consult with attorneys before doing so. They didn't receive the similar type of security interest, yet they continued to represent to investors that their investments were collateralized. What does that have to do with this case? Well, it shows a conscious disregard of risk in terms of if you've proceeded in one way where you've received a certain security interest, then you start selling shares yourself without having given the investors the exact same security interest. Is conscious risk, conscious disregard of risk, Sienter? A conscious recklessness, yeah, of risk. That's what Platform Wireless says. I also did want to mention we've been focusing on Sienter about the collateralization. There is another misstatement as well to which there is undisputed evidence and no genuine dispute of material fact as to Sienter, and that is regarding the statement that they were investigating whether they were selling securities when in fact they had received knowledge that they may have violated the securities laws. Again, all four defendants, and I'm not doing this in a group pleading sense, all four defendants separately stated that they acknowledged, that they understood, that they were told that they may have been violating the securities laws, they were told this by their attorneys, yet they continued to sell the investments without disclosing that. I thought you just said that the misstatement was their statement they were investigating it. That's a misleading statement without revealing that what they had actually already learned was that they may have been violating the securities laws. Hirsch's testimony himself at ER 840 to 841, he acknowledges that there's a difference between those two things from an investor's perspective. Does that mean the collateral problem could be bad news? Is that what that was meant? The we may be a security? Yeah. It's in your brief. I quoted you. I mean, I think those are two. It's the bad news. I mean, both are pretty bad news. Not being secured at all is bad news from an investor's perspective. Finding out that the securities you just bought have actually been sold in violation of the securities laws, in particular because you haven't received the protections of a disclosure, you haven't received the protections of being an accredited investor. Now, was that, according to the record, was all that explained to them, or was it just that they were told there's bad news? No, they were told that they may have been violating the securities laws, and all four defendants acknowledged that this could be a major issue, this could be a concern going forward, which is why they then attempted to create a public offering memorandum, all these things they should have done in the first place, an accreditation questionnaire, all these things they should have done in the first place and never actually ended up doing, but that's why that process got put in motion. I hate to jump back to the other scienter, the other misrepresentation, but there is just one other thing I just wanted to mention, which is, you know, after they learned the information from the Quarles and Brady's attorneys, after they were told that their documentation was defective or nonexistent, they then issued a new document to investors, which is called the Loan Participation Disclosure Statement. It appears numerous times in the record, but ER 1541 is one example. That said, the participant will have a security interest in the loan in that the note is secured by a lien on the assets of borrower as described in the security agreement. That agreement did not exist. They cobbled together this document from drafts put together by the Quarles and Brady's attorneys who did not authorize them to use it, and then they basically doubled down on their misstatement. When told by the attorneys that there was a problem, they did as Hirsch said, pardon the colloquial language, he wanted to CYA, he wanted to send out this document, but what it did was refer to investors to other documents, such as a security agreement, which did not exist, giving them a false sense of security. This, again, is another indicator of their scienter. I do think it's important just to touch briefly on the threshold issue about whether these instruments are actually securities. We believe that the district court got it correct, that these are investment contracts under Howey. We also believe that there are alternative. The directions to purchase, that is a security under Howey. Yes. And that's actually an important point because I think there was some confusion injected by the reply brief. The suggestion in the reply brief, which was raised for the first time on reply, was that what was sold to the investors was actually the promissory note going from mortgage limited to radical money. That's simply incorrect. What was sold to investors was the direction to purchase. There's absolutely nothing in the record to suggest that the promissory note given by mortgage limited to radical money was somehow jointly held by the participants. The promissory note doesn't say that. And there's no document assigning, from radical money, assigning to participants any interest in that note. And I just want to finish on one point about the sort of Reeves versus Howey, because it's an issue that's important for the commission. There was a suggestion made that if a court analyzes an instrument under one definition of the Securities Act, investment contract, it can't go on then to review it under another definition, such as note. There's no support for that anywhere in the case law. I would turn the Court to the Supreme Court cases of Cheropen, Cheropen versus Knight, Reeves itself, and Joiner, all of which reject the notion that if something fits into one category, it can't also fit into another category. Haven't we already decided that in this circuit? I don't think that this Court has expressly decided that. R.G. Reynolds would be a case in which the Court has conducted the dual analysis. There's certainly no case in which a court has adopted the position that the defendants are suggesting here. Several courts have rejected it. And it's also just contrary to Congress's purpose. The purpose was to define security as broadly as possible. If Your Honors don't have any other further questions. Thank you. Are you going to give them a minute or not? Yes. Why don't you take a ---- give the gentleman a minute for ---- Thank you, Your Honors. I just want to quickly ask the Court, please, if you look at the SEC's brief, the only evidence they cite for the purported misrepresentation regarding holding their own deeds of trust is 1527. Absolutely no other evidence about it. That is a critical issue here. It is a dispute of fact. On the issue of the disclosures that Mr. Berger referenced, could they in hindsight have been more robust? Absolutely. No question about that. And I take Judge Wallace's point. But the issue here is state of mind. And it was inappropriate for the judge to resolve factual disputes about what Quarles and Brady said, especially when there are significant problems with their credibility corroborated by other evidence. The judge essentially resolved those credibility issues in place of the jury. And that was inappropriate. Thank you. Thank you, counsel. Thank you for giving me your time. The case of SEC v. Radical Bunny, LLC, et al. is mark submitted.
judges: Restani, Wallace, Bea